Hal SNOWDEN, Jr., Appellant

v.

CITY OF WILMORE, Kentucky; The
Wilmore City Council; Robert L. Gul-
lette, Jr., Individually and in his Ca-
pacity as City Attorney of Wilmore;
Harold Rainwater, Individually and in
his Capacity as Mayor of the City of
Wilmore and Member of the City
Council of Wilmore; Leonard Fitch,
in his Capacity as a Member of the
City Council of Wilmore; Jeff Baier,
in his Capacity as a Member of the
City Council of Wilmore; Kim Deyer,
in her Capacity as a Member of the
City Council of Wilmore; Edward
McKinley, in his Capacity as a Mem-
ber of the City Council of Wilmore;
and Mary Jo Morrow, in her Capacity
as a Member of the City Council of
Wilmore, Appellees.

No. 2010–CA–01585–MR.

Court of Appeals of Kentucky.

Jan. 11, 2013.

Discretionary Review Denied by Supreme
Court Nov. 13, 2013.

Mason L. Miller, Lexington, KY, for appellant.

Calvin R. Fulkerson, Lexington, KY, Charles D. Cole, Lexington, KY, for appellees.

Before COMBS, MOORE, and NICKELL, Judges.

## *OPINION*

NICKELL, Judge:

Hal Snowden, Jr. appeals from three orders of the Jessamine Circuit Court denying a motion to recuse the trial judge, dismissing his complaint with prejudice, and denying a motion to reconsider the dismissal. The crux of this appeal is whether the City of Wilmore ("City"), through its City Attorney, Robert L. Gullette, Jr., or its Mayor, Harold L. Rainwater, promised to amend its planned unit development (PUD) regulations in ex-change for Snowden's dismissal of two pending lawsuits. Snowden claims Gullette made oral representations to him binding the City to not only refer a PUD amendment to the Jessamine County/City of Wilmore Joint Planning Commission ("Commission") for consideration and a recommendation, but to fully support and pass the amendment regardless of the Commission's recommendation. As it happened, the City referred Snowden's proposed amendment to the Commission; Snowden signed agreed orders dismissing the pending litigation; and upon receiving a negative recommendation from the Commission, the City rejected Snowden's proposed amendment, thereby thwarting his plan to develop a "New Urbanism" residential community.[1] Snowden now claims the City breached its agreement with him and seeks compensatory and punitive damages as well as passage of the amendment. Having reviewed the record, the law and the briefs, we affirm.

## BACKGROUND

Snowden owns a parcel of land in Jessamine County named Roseglade Farm. In the 1990's, the land was annexed by the City and rezoned for residential use but never developed. Now, to develop the property as he envisions, Snowden needs the City to amend its zoning ordinance to allow use of the "New Urbanism" design concept.

The owners of Forest Creek, a nearby piece of unincorporated Jessamine County property, also plan on developing a residential community along with a golf course but no other commercial ventures. Forest Creek was situated about a mile outside the City limits and therefore was not contiguous. Since a city may annex only con-

---

1. "New Urbanism" is a design concept featuring compact, multiuse communities in which all the needs of daily life (housing, work, retail, entertainment, schools, parks and civic facilities) are within a ten-minute walk of one another.

tiguous land,[2] Snowden believes the City set about annexing a narrow mile-long corridor of useless property from landowners who favored the Forest Creek development just to achieve contiguity and permit the streamlined annexation process described in KRS 81A.412.[3] The City annexed the now-contiguous Forest Creek in January of 2007.

Snowden filed lawsuits against the City and its officials in 2006 and again in 2007 challenging the annexation of Forest Creek.[4] Both lawsuits were dismissed with prejudice on February 6, 2009, pursuant to two agreed orders executed by Snowden; his attorney, John Reynolds; Gullette, on behalf of the City; the attorney for the Commission; and, the attorney for Forest Creek, LLC and Kelley Properties, LLC.

Upon learning the City would not adopt his proposed PUD amendment, Snowden filed a complaint against the City, its officers and Gullette alleging breach of contract and several torts. After the trial court granted the City's/Gullette's motion to dismiss, Snowden filed this appeal claiming he was duped into dismissing the pending litigation because the City never intended to amend its PUD ordinance. The specific questions before us are whether the trial court properly dismissed the current complaint upon finding there was no written contract obliging the City to amend its PUD ordinance, and whether the trial court should have recused from the case due to a professional relationship with Gullette.

## FACTS

The records of the 2006 and 2007 litigation are not before us and no discovery has occurred. Therefore, our recitation of the facts is taken from the pleadings filed in this case, four hearings and the appellate briefs. We rely heavily upon Snowden's complaint alleging that in February 2007, Gullette, *on behalf of the City,* attempted

---

**2.** Kentucky Revised Statutes (KRS) 81A.410 reads in relevant part:

(1) Except as provided in KRS 67C.111(3), a city legislative body may extend the city's boundaries to include any area:
(a) Which is adjacent or contiguous to the city's boundaries at the time the annexation proceeding is begun; and
(b) Which by reason of population density, commercial, industrial, institutional, or governmental use of land, or subdivision of land, is urban in character or suitable for development for urban purposes without unreasonable delay.

**3.** KRS 81A.412 reads:

A city may annex any area which meets the requirements of KRS 81A.410, if each of the owners of record of the land to be annexed gives prior consent in writing to the annexation. In this event, the city shall not be required to enact the notification ordinance required by KRS 81A.420(1) or to comply with the notice requirements of KRS 81A.425, and it shall not be required to wait the sixty (60) day period provided for in

KRS 81A.420(2) prior to enacting a final ordinance annexing the area. When a city has obtained the prior written consent of each owner of record of the land to be annexed, the city may enact a single ordinance finally annexing the land described in the ordinance. If the city has elected to establish the zoning for the new territory pursuant to KRS 100.209 prior to the completion of annexation under this section, the ordinance annexing the territory shall include a map showing the zoning. Upon the enactment of this ordinance, the territory shall become a part of the city.

**4.** *Snowden v. Rainwater, et al.,* Jessamine Circuit Court Case No. 06–CI–00908, was filed October 23, 2006, seeking to have Ordinance No. 568–06 declared null and void and rescinded, and to prohibit annexation of Forest Creek. *Snowden v. City of Wilmore, et al.,* Jessamine Circuit Court Case No. 07–CI–00116, was filed on February 7, 2007, seeking to declare the rezoning of Forest Creek to be ineffective. The records of these cases, now dismissed with prejudice, are not before us.

to settle the dispute with Snowden over the annexation of Forest Creek without success. A few months later, in June 2007, Gullette again tried to settle the dispute— *this time approaching Snowden on behalf of the owners of Forest Creek.* Snowden alleged that after lengthy talks with Gullette, it was agreed that: (a) Snowden would not oppose the Forest Creek development; (b) Snowden would develop Roseglade Farm without opposition from Forest Creek and with the City's support; and (c) "in exchange; Snowden would dismiss both the 2006 Litigation and the 2007 Litigation." The complaint further alleged:

> At all relevant times, Defendant Gullette was representing and acting on behalf of both Forest Creek and the governmental-related Defendants in the 2006 Litigation and the 2007 Litigation, and he further represented to Snowden and his counsel that Snowden would have the unanimous support of the Defendants for the PUD Amendment (as defined herein).

In August 2007, Snowden and the Forest Creek developers executed a written settlement agreement contingent upon Snowden reaching a separate settlement agreement with the City regarding the pending lawsuits. The City was not a party to Snowden's agreement with Forest Creek and Gullette maintained a separate settlement agreement between Snowden and the City was necessary, but no formal contract was ever executed. Based upon Gullette's oral representations alone, Snowden arranged for a development plan to be drawn

for Roseglade Farm and an amendment to the City's PUD ordinance to be drafted.[5]

■ According to the complaint, on January 9, 2009, Gullette met with Snowden and his attorney and

> Gullette represented to Snowden, in order to induce Snowden to dismiss the 2006 Litigation and 2007 Litigation, that [the City], the Council and the Councilmembers would effectuate the passage of an amendment to the [City] Zoning Ordinance that would permit Planned Unit Development such that Roseglade Farm could be developed as previously agreed (the "PUD Amendment"). Such representations were made by Gullette both in his capacity as counsel for and on behalf of and as agent for [the City], the Council and the Councilmembers.

At this point, Snowden had nothing in writing from the City, only alleged oral representations from Gullette, and there is no evidence or suggestion that Snowden had spoken directly to Mayor Rainwater, the council as a whole, or any of the councilmembers[6] to get a commitment to pass the PUD amendment from any of them.

Thereafter, a series of four letters was written by various authors to different recipients that Snowden maintains constituted an agreement between himself and the City in which the City agreed to pass the PUD amendment and then failed to do so. He argues these four letters contained an offer and acceptance, partial performance by the City and full performance by Snowden. Being integral to this appeal, we set forth the text of each letter in full, separated by our comments about its import.

---

5. Presumably, Snowden would also claim the City had breached its alleged contract if it had passed an amendment to the PUD ordinance that differed from the version he had submitted for the City to enact. When the settlement agreement was allegedly reached, no one from the City had seen the amendment Snowden would eventually submit for adoption. The proposed amendment is not part of the record before us.

6. A single councilmember cannot bind a municipality. *See Louisville Extension Water Dist. v. Diehl Pump & Supply Co.,* 246 S.W.2d 585, 586 (Ky.1952).

February 2, 2009

Mr. Peter Beatty, Chairman
Joint Planning Commission
North Main Street
Nicholasville, Ky. 40356
IN RE: Proposed Amendment to Wilmore Zoning Ordinance for New Urbanism Development within P.U.D.

The **Wilmore City Council** has taken official action this date to **request that the Jessamine County/City of Wilmore Joint Planning Commission consider the attached draft legislation as an amendment to the Wilmore Zoning Ordinance.** This proposed amendment is intended to allow for "New Urbanism" development within the City's existing P.U.D. regulations.

I would appreciate it if you could set this matter for a public hearing during the March, 2009 regular meeting of the Planning Commission. **At the conclusion of the Commission's consideration of this proposed amendment, please forward a recommendation** regarding this matter to our attention for final action.

If you need any further information concerning this matter, please feel free to call at any time.

Yours very truly,

s/s

Mayor Harold L. Rainwater

(Emphasis added). The foregoing letter was sent to the Commission after the Council voted to authorize Mayor Rainwater to do so. It was not addressed or copied to Snowden, did not reference Snowden, and merely referred a proposed amendment of the City's existing PUD ordinance to the Commission for consideration and a recommendation. It did not in any way suggest the City would adopt the proposed amendment regardless of the Commission's recommendation. In his complaint, Snowden alleges this letter constituted the City's partial performance of its obligations under the settlement agreement. As noted previously, there is no formal contract or settlement agreement between Snowden and the City. Therefore, any alleged written settlement agreement between the parties must be found within the four corners of these four letters. *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.,* 94 S.W.3d 381, 385 (Ky.App.2002).

February 3, 2009

Hon. John Reynolds
South Main Street
Nicholasville, Ky. 40356
In Re: Snowden vs. City of Wilmore and Forest Creek, LLC litigation
Dear John,

I have enclosed herewith a copy of Mayor Rainwater's letter to the Jessamine County/City of Wilmore Joint Planning Commission. Since I have never done a referral letter of this type, I called Bruce Smith and used his suggested language. Also, the March, 2009 meeting was selected because the February meeting has been cancelled.

I have also included the originals of the Agreed Orders dismissing the causes of action. It is imperative that I have you sign the Agreed Orders today. Bruce is going to have a great deal of work ahead of him in order to get the necessary authorization to sign as counsel for the Planning Commission and without his signature I cannot forward the Orders to the Judge. Please call as soon as you hear from Mr. Snowden.

If you have any questions or need any additional information, please feel free to call.

Yours very truly,

s/s

Robert L. Gullette, Jr.

The foregoing letter to Snowden's attorney confirms Snowden's proposed amendment was referred to the Commission and seeks speedy return of the signed agreed orders dismissing the 2006 and 2007 lawsuits. Significantly, the letter does not state or suggest *passage* of the proposed amendment has been promised or will be forthcoming.

February 4, 2009

[2] Hon. John Reynolds

400 North Main Street

Nicholasville, Ky. 40356

In Re: Snowden vs. City of Wilmore, et al litigation

Dear John,

Approximately one month ago, I met in your office with you, Mr. Snowden and Mr. Banks in an effort to finally reach some common ground in order to resolve the longstanding disputes that exist between our clients. During this meeting Mr. **Snowden made an offer to immediately drop all litigation if the City of Wilmore would refer the issue concerning the proposed "New Urbanism" amendment of the Wilmore Zoning Ordinance to the attention of the Joint Planning Commission. At that time, I assured Mr. Snowden that I thought that the City would agree with his proposal.** He and I shook hands and I left the meeting with the specific aim of carrying out his wishes. **During the following weeks no change in Mr. Snowden's demands were [sic] ever made known to me.**

On Monday, February 2, 2009, I spoke with you and was assured that Mr. Snowden's position had not changed. I advised that I was meeting with the Wilmore City Council that evening and I hoped to resolve the matter within the week. That night a lengthy closed session was held. At the conclusion of that discussion, the City Council voted to authorize the Mayor to sign the letter, a copy of which I provided to you yesterday. Needless to say, **I looked forward to immediately receiving the signed Agreed Orders of Dismissal relative to the pending litigation, as was promised by your client.**

Based upon the fact that they were not returned, I must conclude that Mr. Snowden has refused to honor his agreement. Neither I, nor my clients, plan to remain victims of Mr. Snowden's apparent inability to follow through on his commitments. This matter is now in its fourth year and, to be very candid, all of us on this side of the ball are fed up with the whole mess. For that reason, I offer Mr. Snowden the balance of the day to do what he pledged to do and have you sign the Agreed Orders. **If I have not received the signed originals back by 4:00pm [sic] today, then you may consider the offer of the City of Wilmore (set forth in the aforementioned letter) to be withdrawn and of no legal force and effect.** At that point in time, the position of control that Mr. Snowden has enjoyed over the past several years will end. The City of Wilmore and Forest Creek, LLC will assume the position of lead dog. We will return to the legal arena where, to be very candid, we should have already resolved this matter.

On Monday night, **I will ask the Wilmore City Council to take two actions.** The first will be to **rescind the action, taken on February 2, 2009, when it referred the "New Urbanism" issue to the Joint Planning Commission.** The second, will be to **officially notify both Mr. Snowden and the Joint Planning Commission that the City of Wilmore has no desire to see the Roseglade Farm developed in the**

"New Urbanism" design and to request the Commission not to consider any such amendment of the Wilmore Zoning Ordinance. Assuming that this action is taken, on Tuesday, I will file a Jessamine Circuit Court Case on behalf of James W. Kelley, Diana G. Kelley, James A. Kelley, William Robinson and Forest Circle, LLC against Hal Snowden, Jr. This action will be a Declaration of Rights suit seeking the Court's opinion as to whether or not the Settlement Agreement, dated August 14, 2007, is still binding on the parties thereto. I believe that the Court will conclude, as I already have, that the official action of the Wilmore City Council (assuming it is taken on Monday, February 9, 2009) in refusing to consider the "New Urbanism" development will terminate the obligations of all parties relative to this agreement.

Once the Circuit Court releases the parties from the terms of the Settlement Agreement, we will again resume the pending litigation, without delay. Win, lose or draw, we will continue until the Forest Creek Subdivision and Jack Nicklaus Signature Golf Course are either a reality or a legal impossibility. During that time, Forest Creek, LLC will be at liberty to return Mr. Snowden's many favors and flex its own considerable legal muscle at his every attempt to develop Roseglade Farm. To be very candid, you and I will probably be the only real winners. At a couple of hundred dollars an hour, we might both retire on this series of cases. But it doesn't have to be that way. Your client and your client alone has the ability to bring this madness to an end.

I will not call you today and I apologize for bothering you so much yesterday. There is simply nothing left to say. I will not further debate or argue. No changes in the letter will be made, and

therefore, none will be discussed. I hope you will feel free to share with your client your opinion concerning my truthfulness. I assure you that the position taken herein is in no way a bluff. At some point a line must be drawn in the sand and the purpose of this letter is to draw one. Your client has until 4:00 p.m. today to decide to do what is right and to make a win possible for all concerned. After that, the decisions will no longer be his to make.

If you have any questions or need any additional information, please feel free to call.

Yours very truly,

s/s

Robert L. Gullette, Jr.

(Emphasis added). In the opening paragraph of this, the third letter, Gullette clearly states *Snowden offered* to dismiss the 2006 and 2007 lawsuits if the City would refer his proposed amendment to the Commission. Overtly missing from this letter is any mention of *passage* of the PUD amendment as a condition for dismissal of the pending litigation. The City referred the amendment to the Commission, as evidenced by the letter signed by Mayor Rainwater, and thus it appears the City satisfied any obligation it may have undertaken. Snowden has produced no writing correcting Gullette's statement of the terms of the agreement or otherwise clarifying that his dismissal of the pending lawsuits was in exchange for not only the Commission's consideration of the PUD amendment, but the City's actual passage of the PUD amendment. Snowden argues this letter is critical because Gullette used the word "offer" and "demanded" that Snowden dismiss the pending litigation, which Snowden did, thus accepting the City's offer and thereby providing two essential elements of a valid contract—offer

and acceptance. *Cantrell,* 94 S.W.3d at 384; *see also* 15B Am.Jur.2d *Compromise and Settlement* § 6.[7]

February 4, 2009

Hon. Robert L. Gullette, Jr.

P.O. Box 915

Nicholasville, Kentucky 40340

*In re: Snowden v. City of Wilmore (06–CI–908 and 06–CI–116)*

Dear Bobby:

I am in receipt of your hand delivered letter of this date, February 4, 2009. **In response to the terms set forth therein I am attaching** hereto the **signed Agreed Orders of Dismissal as agreed to and negotiated** in the above styled matters. Please note I am not including 06–CI–526 as that case has already been dismissed by Order of the Jessamine Circuit Court Entered 8–29–06. I have included a copy of said Order herewith for your convenience.

Thank you and please know that we look forward to working with you on this matter.

Sincerely,

s/s

JOHN E. REYNOLDS

(Emphasis added). The fourth letter, from Snowden's attorney to Gullette, was a cover letter by which Snowden returned the signed agreed orders of dismissal. Again, there is no mention of dismissal of the lawsuits being predicated upon the City's passage of the PUD amendment, an event that had not occurred when Snowden signed the agreed orders of dismissal. In fact, the letter specifically states the pending litigation is being dismissed "[i]n response to the terms set forth" in Gul-

lette's letter of February 4, 2009. The only term mentioned in that letter was "all litigation [would be dropped immediately] if the City of Wilmore would refer ... the 'New Urbanism' amendment ... to the ... Commission."

Based upon these four letters, the only writings under consideration, Snowden's legal challenges to the annexation of Forest Creek were dismissed with prejudice following the tendering of agreed orders Snowden signed seeking that specific result. Because the City never adopted the PUD amendment, Snowden filed the current complaint on April 8, 2010, alleging breach of contract and tort claims. Specifically, Snowden claims the City, City Council, its mayor and all councilmembers, breached their contract with him, both actual and implied; caused Snowden to detrimentally rely upon their promise to pass the PUD amendment (promissory estoppel); breached their implied duty of good faith and fair dealing; and, violated Snowden's due process rights by exerting arbitrary power. He also alleged that all defendants committed promissory fraud and/or fraudulent inducement. He then included two counts against Gullette alone for tortious interference with contract claiming he allegedly advised the City to reject the PUD amendment; and negligent misrepresentation claiming he allegedly gave Snowden the impression he was authorized to settle the 2006 and 2007 lawsuits and assured him the City would amend the PUD ordinance.

On May 12, 2010, Snowden moved for a temporary restraining order (TRO) to maintain the *status quo.* That motion was heard on May 13, 2010. At that hearing, Gullette tried to give context to a discus-

---

7. "An agreement alleged to be in settlement and compromise of a dispute or pending lawsuit must meet the same requisites of formation and enforceability as any other contract. All essential elements of a valid contract must exist, including an offer and acceptance, consideration, and an intent to be bound." (Internal citations omitted).

sion he had with Snowden in 2007. Gullette stated he tried to discern from Snowden what would satisfy him. At that time, Snowden's proposal to develop 425 home sites had been approved for just 175 lots, but Snowden told Gullette he would be satisfied if allowed to develop 350 units. Gullette said he *thought* the City might approve the 350 units, but made it clear that the City would likely oppose any commercial development that might compete with downtown businesses—an integral part of the New Urbanism model. At the hearing, Gullette further told the trial court that from his review of Snowden's poorly drafted proposed PUD amendment, passage would have eliminated the City's existing PUD regulations. Gullette confirmed the only agreement he reached with Snowden, as reflected in subsequent correspondence, was that the City would refer the PUD amendment to the Commission, which it did. Ultimately, the TRO was denied on June 14, 2010.

In late May, 2010, all defendants moved to dismiss [8] the action. Following extensive briefing and argument, the trial court dismissed the complaint with prejudice on July 13, 2010. Although not reflected in the written order, the trial court explained its ruling at the conclusion of a hearing on the City's motion to dismiss on July 8, 2010, wherein the trial court found that multiple letters could constitute a writing, but only if those letters referenced one another.[9] Because Mayor Rainwater's letter of February 2, 2009, did not reference Gullette's as yet unwritten letters of February 3 and 4, 2009; did not indicate the mayor was adopting some future action by Gullette; and did not mention Reynolds'

future letter of February 4, 2009, the trial court found these letters could not form a binding contract. Moreover, even if the letters formed a binding contract, none of them promised to give Snowden that for which he now claims he bargained—*passage* of the PUD amendment. At most, the City promised to *refer* the PUD amendment to the Commission, which it did, but nowhere in any of the letters did it promise to pass an amendment. The trial court stated it appeared the City had been inclined to amend the PUD ordinance at one time—why else would it have referred the proposed amendment to the Commission—but ultimately changed its mind, as it was authorized to do.

The trial court additionally stated the City Council speaks through its minutes and actions, and for it to act, a motion, second, and passing vote were needed—none of which paved the way for the City's passage of the PUD amendment. Furthermore, no one, not the mayor and not the city attorney, could bind the council to take future legislative action because only the council could bind itself. *See* KRS 83A.130.

The trial court also stated that while Gullette was authorized to negotiate on the City's behalf, Snowden participated in those discussions at his own peril. While Snowden may have relied on Gullette's representations, he could not legally and justifiably do so. Noting that dealing with the public sector differs from dealing with the private sector, the trial court stated it was Snowden's responsibility to know the extent of Gullette's authority. Lastly, the trial court found the only guarantee of the

---

8. Gullette filed a motion to dismiss on May 21, 2010, while all other defendants filed a joint motion to dismiss on May 26, 2010.

9. Though the trial court's written order contains no citations, the Restatement (Second)

of Contracts § 132 states multiple writings may form a contract so long as "one of the writings is signed and the writings in the circumstances clearly indicate that they relate to the same transaction."

City's amendment of the PUD ordinance—and the only action upon which Snowden could safely rely—was a vote by the City Council adopting the desired change.

Following an additional hearing, the trial court stated its decision to dismiss the complaint would stand. A motion to reconsider, set aside or vacate that order was denied on August 23, 2010. This appeal followed.

## RECUSAL

As a preliminary matter, we begin with Snowden's claim that the trial judge should have recused from the case because he appeared to have "a close professional relationship" with Gullette "who has served as sole City Attorney for the City of Wilmore (located in Jessamine County) for at least 27 years and as an Assistant Jessamine County Attorney for at least 4 years." After contacting the Judicial Ethics Commission for advice, the trial judge denied the motion to recuse stating that if he had any reservations about issuing a fair ruling in the case he would step aside, but having no such reservations he would deny the motion to recuse. For the following reasons, we affirm.

■ The rule on recusal is that, "[a] trial judge should disqualify himself in any proceeding where he has knowledge of any circumstances in which his impartiality might reasonably be questioned." *Webb v. Commonwealth*, 904 S.W.2d 226, 229 (Ky. 1995). KRS 26A.015(2) requires recusal when a judge has "personal bias or prejudice concerning a party ..." or "has knowledge of any other circumstances in which his impartiality might reasonably be questioned." KRS 26A.015(2)(a) and (e); *see also* Rules of the Supreme Court (SCR) 4.300, Canon 3C(1). "The burden of proof required for recusal of a trial judge is an onerous one." *Stopher v. Commonwealth*, 57 S.W.3d 787, 794 (Ky.2001).

"There must be a showing of facts 'of a character calculated seriously to impair the judge's impartiality and sway his judgment.'" *Id.* (quoting *Foster v. Commonwealth*, 348 S.W.2d 759, 760 (Ky.1961), *cert. denied*, 368 U.S. 993, 82 S.Ct. 613, 7 L.Ed.2d 530 (1962)); *see also Johnson v. Ducobu*, 258 S.W.2d 509 (Ky.1953). "A party's mere belief that the judge will not afford a fair and impartial trial is not sufficient grounds to require recusal." *Webb*, 904 S.W.2d at 230.

■ Snowden did not allege actual bias. He argued recusal was necessary only because Gullette often appears before the trial judge and over the years the two had developed a close professional relationship. Such an allegation is insufficient to require recusal. If it did, taken to its illogical conclusion, a judge would have to remove himself from every criminal case filed in his jurisdiction because the prosecutor's and the public defender's frequent appearances in his courtroom would create disqualifying relationships. The same would be true in counties with particularly small bars where the same private attorneys routinely appear before the sole circuit judge. Such is an untenable requirement and clearly not the intent of the cited caselaw, statute and rule. Here, where there is no evidence and not even an allegation of actual bias, we discern no abuse of discretion and therefore, affirm. *See Sommers v. Commonwealth*, 843 S.W.2d 879, 882 (Ky.1992).

## ALLEGED BREACH OF MUNICIPAL CONTRACT

■ We turn now to the heart of this appeal—whether the trial court erred in granting a motion to dismiss with prejudice upon finding letters authored by the mayor and the city attorney did not bind the City to amend its PUD ordinance. We begin with a statement of applicable law.

A motion to dismiss is governed by a rigorous and sweeping standard which dictates that it should be granted only where "it appears the pleading party would not be entitled to relief under any set of facts which could be proved in support of his claim." *Pari–Mutuel Clerks' Union v. Kentucky Jockey Club,* 551 S.W.2d 801 (Ky.1977). When considering the motion, the allegations contained in the pleading are to be treated as true and must be construed in a light most favorable to the pleading party. *See Gall v. Scroggy,* 725 S.W.2d 867 (Ky.App.1987). The test is whether the pleading sets forth **any** set of facts which—if proven—would entitle the party to relief. If so, the pleading is sufficient to state a claim. *See* CR [Kentucky Rules of Civil Procedure] 8.01. Since the trial court is not required to make factual findings, the determination is purely a matter of law. *James v. Wilson,* 95 S.W.3d 875 (Ky.App.2002). Consequently, we review the decision of the trial court *de novo. Revenue Cabinet v. Hubbard,* 37 S.W.3d 717 (Ky. 2000).

*Mitchell v. Coldstream Laboratories, Inc.,* 337 S.W.3d 642, 644–45 (Ky.App.2010). The ultimate question then is if the facts alleged in the complaint can be proved, is the complainant entitled to relief? *James,* 95 S.W.3d at 884. For the following reasons, the answer is no.

 The City of Wilmore is classified as a city of the fourth class. KRS 81.010(4). Organized under the mayor-council plan,

> [a]ll bonds, notes, contracts and written obligations of the city shall be made and executed by the mayor or his agent designated by executive order.

KRS 83A.130(8). Thus, all municipal contracts must be written and signed by the mayor. *City of Greenup v. Public Service*

*Commission,* 182 S.W.3d 535, 540 (Ky. App.2005).

While executive authority is vested in the mayor, KRS 83A.130(3), he does not act alone. Legislative power is vested in a council, KRS 83A.130(11), which adopts ordinances the mayor may sign into law or veto subject to council override. KRS 83A.130(6). Any delegation of mayoral authority to a subordinate officer or employee occurs by executive order only. KRS 83A.130(7).

 Failure to adhere to the procedures outlined in KRS Chapter 83A.130 may be fatal to a municipal contract. As explained in *City of Princeton v. Princeton Electric Light & Power Co.,* 166 Ky. 730, 179 S.W. 1074, 1079 (Ky.1915):

> [t]he laws provide how municipalities may bind themselves, and the contracts to be obligatory must be made in the manner the laws prescribe. A different rule prevails in regard to municipalities to that which governs private persons and private corporations. The persons who contract with municipal corporations must, at their peril, know the rights and powers of the officers of such municipalities to make contracts and the manner in which they must make them. Any other rule would destroy all the restrictions which are thrown around the people of municipalities for their protection by the statute laws and the Constitution, and would render abortive all such provisions. The rule in certain instances may be harsh, but no other is practical.

Finally,

> [a] meeting of the minds, or mutual assent to the terms of a settlement, is essential to the formation of an enforceable settlement agreement. There must be complete agreement on all material terms. Settlement agreements, like oth-

er contracts, are not valid when the parties have merely agreed to later agree.

. . . .

A party's mental reservations and unexpressed intentions will not supersede outward expressions of assent or override objective and unequivocal manifestations of assent to terms of the settlement agreement. Rather, in deciding whether [a] settlement agreement has been reached, the court looks to the objectively manifested intentions of the parties.

15B Am.Jur.2d *Compromise and Settlement* § 7 (internal citations omitted).

 With the foregoing in mind, we analyze the writings before us. First, a city attorney may negotiate on behalf of a municipality, but he lacks authority to bind the City Council. *Louisville Civil Service Board v. Blair,* 711 S.W.2d 181, 184 (Ky. 1986); *Ashland Lumber Co. v. Williams,* 411 S.W.2d 909, 910–11 (Ky.1966). Any terms that may have been orally agreed upon by Gullette and Snowden had to then be agreed to by a majority of the City Council before becoming the foundation of a written contract that would ultimately be signed by Mayor Rainwater to become effective.

 Those who seek to contract with the government are deemed to know how government works—specifically—who is authorized to bind the municipality and how. *City of Greenup,* 182 S.W.3d at 539–40. "[O]ne contracting with a political subdivision does so at his peril, unless the contract is executed in the manner provided by statute." *Diehl,* 246 S.W.2d at 586. Furthermore, those "who contract with municipal corporations must, at their peril, know the rights and powers of the officers of such municipalities to make contracts and the manner in which they must make them." *City of Princeton,* 179 S.W. at 1079. Here, to have a valid contract with the City for passage of the PUD amendment, Snowden needed approval by the City Council and a written contract signed by Mayor Rainwater—he had neither. Snowden claims the City wrongly used KRS 83A.130(8) as a sword to claim lack of a written contract, but we deem it as nothing more than requiring Snowden to comply with the requirements of the statute.

Although Snowden does not allege Mayor Rainwater personally promised the City Council would pass the PUD amendment, any such allegation would be for naught because a mayor, acting alone, cannot "enter into a compromise agreement settling litigation against the city." 3 McQuillin Mun. Corp. § 12:73 (3d ed.). KRS 83A.130 clearly establishes a two-part system under which the council enacts ordinances and the mayor enforces them, subject to the power of veto. The mayor alone could not decide to amend the City's PUD ordinance. In fact, he would not have cast a vote on the issue unless his vote was needed to break a tie among the other councilmembers. KRS 83A.130(5).

Second, there is no writing in which the City agrees to pass the PUD amendment. KRS 83A.130(8) requires such a writing. Without one, Snowden's claim must fail. The most that has been alleged and supported by writings is the City's referral of the PUD amendment to the Commission in exchange for dismissal of pending litigation. We are hesitant to call the Mayor's letter of February 2, 2009, a contract because we do not believe there was an offer and acceptance, consideration, intent to be bound and a meeting of the minds—the essential components of a valid contract. *Cantrell,* 94 S.W.3d at 385. But, assuming for the sake of argument that a contract existed, its terms were completed because the amendment was referred to the Commission and in return Snowden dismissed

the two pending lawsuits. Based upon the record before us, no other terms were discussed or made part of that alleged contract.

That should end our discussion, but Snowden claims he bargained for more than referral of the PUD amendment to the Commission. He claims Gullette guaranteed him passage of the amendment by the Council—a fact Gullette disputes. The only writings submitted for our *de novo* consideration are the four letters set out previously—none of which mentions anything about passage of the PUD amendment. Snowden would have us read that requirement into the letters, but we cannot.

■ Our duty is to carry out the expressed intentions of the parties. When those intentions are clearly stated in a written document, we have no authority to. add terms not included by the parties. *Hoheimer v. Hoheimer*, 30 S.W.3d 176, 178 (Ky.2000) ("The intention of parties to a written instrument must be gathered from the four corners of that instrument."). Thus, our interpretation of any agreement between Snowden and the City must come solely from the four letters.

If Snowden's dismissal of the two lawsuits was based on more than the terms stated in Gullette's letters, he should have said so when given the opportunity. Instead, the letter from Snowden's attorney accompanying the signed agreed orders of dismissal states the litigation is being dismissed "[i]n response to the terms set forth [in Gullette's letter of February 4, 2009.]" The only term mentioned in that letter is referral of the PUD amendment to the Commission. Thus, from our reading of the correspondence, there is no proof of a written contract in which the City ever promised to do anything but refer the PUD amendment to the Commission, which it did. Lack of a written contract signed by Mayor Rainwater in which the City agrees to adopt Snowden's PUD amendment is fatal to the complaint, just as the trial court concluded.

■ We comment now upon additional points raised in the appeal. Snowden claims the trial court based its dismissal of the complaint on a factual finding that no contract existed between Snowden and the City. He claims this was error because a motion to dismiss is "purely a matter of law." *James*, 95 S.W.3d at 884. While Snowden correctly states the standard, we disagree with its application to these facts. "Generally, the interpretation of a contract, including determining whether a contract is ambiguous, is a question of law for the courts and is subject to *de novo* review." *Cantrell*, 94 S.W.3d at 385 (internal citations omitted). The trial court interpreted the only writings before it and concluded the only action promised by the City was referral of the PUD amendment in exchange for dismissal of the pending lawsuits. There being no assertion of a writing in which the City bound itself to pass the PUD amendment, there was no scenario under which Snowden could prevail and, therefore, dismissal was appropriate. *James*, 95 S.W.3d at 884.

■ A city council acts only through its formal records which "constitute the only legal evidence of all that was done and that nothing more was done." *Louisville & Jefferson County Metropolitan Sewer Dist. v. General Distillers Corp. of Kentucky*, 257 S.W.2d 543, 547 (Ky.1953). Thus, it cannot be bound by an implied promise. No council minutes have been included in the appellate record and Snowden did not allege the City Council took any formal action regarding the proposed PUD amendment other than directing Mayor Rainwater to refer it to the Commission for consideration and a recommen-

dation. Therefore, no implied promise by the City Council to pass the PUD amendment was alleged, but if it had been, it would fail for noncompliance with KRS 83A.130.

 We turn now to the claims against Gullette for promissory fraud and/or fraudulent inducement,[10] negligent misrepresentation[11] and tortious interference with contract.[12] Snowden bore the onus of knowing what Gullette could and could not do on behalf of the City. *Walker v. City of Richmond*, 173 Ky. 26, 189 S.W. 1122, 1125 (1916) ("[T]hose who deal with municipal officers must know the extent of their authority, and act at their peril upon less than a statutory power duly exercised."); *see also City of Louisville v. Parsons*, 150 Ky. 420, 150 S.W. 498 (1912). As stated in prior opinions, this rule may be "harsh," but it is well-settled and we will not tinker with it. *City of Princeton*, 179 S.W. at 1079.

Regardless of Snowden's inferences or beliefs, Gullette's words, as City Attorney, could not bind the City to take particular action and any reliance thereon by Snowden was unjustified. *Blair*, 711 S.W.2d at 184. Finally, there being no written contract between the City and Snowden for

passage of the PUD amendment, there was no scenario upon which Gullette could have been found liable for tortious interference with a contract.

## CONCLUSION

If Snowden truly believed he bargained with Gullette for guaranteed passage of the PUD amendment by the City, he should have taken steps to clarify the full extent of his demands rather than endorsing Gullette's recitation of the agreement as referral of the PUD amendment in exchange for dismissal of two pending lawsuits. Having failed to do so, he cannot ask this Court to add terms to a contract that the parties did not choose to express themselves. For the foregoing reasons, we affirm the trial court's dismissal of the complaint with prejudice as well as its decision not to recuse from the case.

ALL CONCUR.

---

10. Fraud requires proof of six elements: material misrepresentation by the defendant; falsehood; making of a statement known to be false; to induce action by the plaintiff; reliance by the plaintiff; and injury to the plaintiff. Without proof of all six elements, there can be no claim. *Cresent Grocery Co. v. Vick*, 194 Ky. 727, 240 S.W. 388, 389 (1922).

11. Kentucky recognized the tort of negligent misrepresentation in *Presnell Const. Managers, Inc. v. EH Const., LLC*, 134 S.W.3d 575, 580 (Ky.2004). The Restatement (Second) of Torts § 552 describes it as:

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the

guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

12. The tort is described in The Restatement (Second) of Torts § 766 as:

One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.