RENDERED: FEBRUARY 6, 2026; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-0142-MR

HARPER SUB CLUB, LLC                        APPELLANT

|  | APPEAL FROM BOONE CIRCUIT COURT |
|---|---|
| v. | HONORABLE JAMES R. SCHRAND, JUDGE |
|  | ACTION NO. 17-CI-00662 |

MARKUS RESING                             APPELLEE

AND

NO. 2024-CA-0148-MR

PAIGE MCKEE                              APPELLANT

|  | APPEAL FROM BOONE CIRCUIT COURT |
|---|---|
| v. | HONORABLE JAMES R. SCHRAND, JUDGE |
|  | ACTION NO. 17-CI-00662 |

MARKUS RESING                             APPELLEE

\*\* \*\* \*\* \*\* \*\*

BEFORE:  ACREE, CETRULO, AND TAYLOR, JUDGES.

TAYLOR, JUDGE:  Harper Sub Club, LLC (Sub Club) and Paige McKee bring separate appeals from a judgment upon a jury verdict entered November 17, 2022, in Boone Circuit Court in favor of Markus Resing in an action for breach of contract.  For the reasons stated, we affirm.[1]

## **INTRODUCTION**

On May 16, 2017, Resing filed a complaint in Boone Circuit Court against Sub Club and its managing member, Paige McKee.[2]  Resing claimed he had loaned Sub Club $50,000, in 2010, and that Sub Club was in breach of contract for failing to repay him; that Sub Club had sold and then fraudulently conveyed its assets in an effort to hinder, delay, and/or defraud him as its creditor; and that McKee's actions as Sub Club's managing member, which had rendered Sub Club incapable of repaying the loan, warranted piercing Sub Club's corporate veil to

---

[1] Harper Sub Club, LLC (Sub Club) and Paige McKee timely filed Kentucky Rules of Civil Procedure (CR) 59.05 motions that were not resolved until entry of the court's January 3, 2024, order.  The appeals were timely filed in February of 2024.  The trial court entered a separate order on January 3, 2024, that also awarded CR 11 sanctions against appellants that is also on appeal.

[2] Paige McKee is a licensed attorney in Kentucky who represents Sub Club and herself, *pro se*, in this appeal.

hold her personally liable for the outstanding $50,000 loan balance.[3]  On October 31, 2022, thru November 3, 2022, a jury trial was conducted on Resing's breach of contract claim.  Resing's fraudulent conveyance and corporate veil claims were tried before an advisory jury at that time, and Resing prevailed on each claim.[4]  Postjudgment motion practice ensued, and these appeals followed.

Sub Club's and McKee's appeals, respectively Nos. 2024-CA-0142-MR and 2024-CA-0148-MR, take issue with three of the circuit court's orders entered during this litigation:  (1) the November 17, 2022, trial order and judgment that adjudicated Resing's claims in his favor, granted him judgment against Sub Club and McKee in the amount of $50,000, and awarded him prejudgment interest; (2) the circuit court's order of January 3, 2024, which awarded Resing sanctions against Sub Club and McKee; and (3) the circuit court's order of March 7, 2024, which denied Sub Club's motion to appoint a receiver.  Additional facts will be addressed as necessary.  Upon review, we affirm.

---

[3] As will be discussed, Sub Club operated a Jimmy John's restaurant in Crescent Springs, Kentucky.

[4] The same jury considered the contract claim, fraudulent conveyance claim, and corporate veil claim.  As concerns the fraudulent conveyance and corporate veil claims, the jury acted in an advisory jury role.  We note that advisory jury instructions "are not subject to the [same] rigid requirements of instructions given in a case where the issues of fact are triable by a jury as a matter of right." *Wells v. Wells*, 346 S.W.2d 33, 36 (Ky. 1961).  A circuit court is not bound by an advisory jury verdict yet it may adopt the verdict as part of the court's findings.  *Id.*

# ANALYSIS

## I. **November 17, 2022, Trial Order and Judgment**

### A. Breach of Contract Claim

#### 1. Background

Resing's breach of contract claim was only against Sub Club. It largely involved the operative effect or purported ineffectiveness of a "convertible feature option" described in sections 3.(c)-(e) of an agreement, styled "Promissory Note," between Resing and Sub Club executed on October 12, 2010. The relevant substance of their agreement was as follows:

> **1. BORROWER'S PROMISE TO PAY**
>
> In return for a loan I have received, I, **Harper Sub Club, LLC**, the "Company", a Kentucky Limited Liability Company, promise to pay **fifty thousand (U.S. $50,000) dollars** (this amount called "Principal") plus interest, to the order of **Markus Resing**, the Lender. I will make all payments under this Note in the form of cash, check, or money order.
>
> I represent and agree that this loan is a commercial transaction and not a personal, residential, or agricultural, transaction.
>
> **2. INTEREST**
>
> Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate equal to 8% per cent [sic] per year.

## 3. PAYMENT & RIGHT TO CONVERT

### (a) Time and Place of Payments

If, on October 12, 2012, which is called the "Maturity Date," I still owe under this Note, I will pay the remaining balance due on this Note in full. This is commonly known as a *Balloon Payment*." The remaining balance due on this Note is called the "Balance Due."

I will make all payments to Note Holder at a place designated by Note Holder.

### (b) Amount of Payment

I understand and acknowledge that that interest is calculated based upon a [sic] annual simple interest amortization. I again understand and agree that on the Maturity Date, October 12, 2012, I must pay the remaining balance due herein.

### (c) Borrower's Convertible Feature Option.

At any time before full the [sic] satisfaction of this Note, Borrower may opt to convert the remaining Balance Due on this Note into a percentage interest in Harper Sub Club, LLC. This is commonly known as a "Convertible Feature."

### (d) Lender's Convertible Feature Option.

At any time after June 12, 2012, Borrower may give notice to opt to convert the remaining Balance Due on this Note into a percentage interest in Harper Sub Club, LLC. If Borrower fails to fully pay the remaining Balance Due on this Note by the Maturity Date, Lender shall be entitled to a percentage interest in Harper Sub Club, LLC.

**(e) Terms Common to Convertible Feature.**

The covenants common to the Convertible Features herein are:

1. Upon Conversion, Lender shall convey and deliver this Note to the Company and the Company shall issue a Member Certificate to Lender or Lender's designee.

2. The Percentage Interest of the Conversion shall be 7% of The Company.

3. Lender shall have all the rights and privileges of a Member of the Company.

4. All notices regarding conversion shall be in writing and conveyed by both Priority US Mail with Delivery Confirmation and eMail.

Resing alleged that Sub Club never repaid any of the outstanding principal balance of the loan before or after the note's October 12, 2012, maturity date – despite repeated promises from its managing member, McKee, that it would do so; that the loan was never converted into an ownership interest under the terms of sections 3.(c)-(e) set forth above; and that Sub Club was accordingly in breach. This claim was later tried before a jury. At the conclusion of the trial, the jury was instructed to decide the merits of Resing's allegations – as well as Sub Club's defenses that Resing had breached the agreement first or was estopped from enforcing the contract. The jury thereafter found in Resing's favor. It determined Resing had not breached the agreement and was not estopped from enforcing the October 12, 2010, agreement. The jury found that Sub Club had breached the

agreement and had not converted the outstanding balance owed to a 7 percent ownership interest in the LLC; and the jury awarded Resing $50,000. The circuit court then entered judgment in conformity with the jury's verdict.

Sub Club cannot argue the evidence adduced at trial was insufficient to support the jury's findings and verdict regarding this claim because it failed to move for a directed verdict at the close of all the proof. *See Steel Technologies, Inc. v. Congleton*, 234 S.W.3d 920, 926 (Ky. 2007), *abrogated on other grounds by Osborne v. Keenly*, 399 S.W.3d 1, 16-18 (Ky. 2012). Sub Club also makes numerous assertions throughout its brief that it fails to support with citations to the record or authority, which we will not address. For example, it makes the following passing remark in the "statement of facts" in its brief:

> Sub Club formally converted Resing from an assignment of ownership interest to a full membership in post-suit notices and amendment to the Operating Agreement. This amendment also memorialized winding-up liabilities and assets. However, the trial court barred these post-suit amendments and evidence, undermining Sub Club's statutory and contractual defenses. . . .

Sub Club's Brief at 8. We will not review this point because Sub Club does not explain why the circuit court "barred these post-suit amendments and evidence," or how it erred in doing so. It is not the responsibility of this Court to construct legal arguments on behalf of an appellant and scour the record to find where it might

provide support for their claims. *Harris v. Commonwealth*, 384 S.W.3d 117, 131 (Ky. 2012).

The only comprehensible arguments Sub Club presents with respect to Resing's breach of contract claim take aim at the circuit court's multiple rejections of a theory or constituent parts of a theory Sub Club began espousing in late 2019, based on the premise that a "key transaction"[5] – a purported "assignment" – occurred between Sub Club, McKee, and Resing at or about the time the October 12, 2010, agreement was executed, and that it precluded Resing's claim. Sub Club provided what is perhaps the best summary of its theory in an "amended and supplemental answer" that it moved (unsuccessfully) for leave to file on October 3, 2022, less than two months before trial. There, in relevant part, Sub Club alleged:

> 4. . . . McKee denies that either she or Harper Sub Club, LLC[,] borrowed money from Resing. A Commercial Instrument was drafted and signed between Markus Resing and Harper Sub Club, LLC (hereinafter "Sub Club[,] LLC") for commercial purposes and not for any consumer purposes; and, McKee denies that she borrowed money from Resing and asserts that the Commercial Instrument operated as it was intended: 1) to facilitate the sale of 7% of McKee's ownership of Sub Club to Resing for $50,000.00; 2) that Sub Club never intended to be a debtor of Resing; 3) that Sub Club issued the instrument but did not deliver it with the intent that Resing become a creditor; 4) that McKee immediately became a transferee of the Commercial Instrument for value; and 5) that the Commercial Instrument was surrendered to Sub Club, LLC[,] making Sub Club the

---

[5] Sub Club's Brief at 8.

Holder in Due Course of the Instrument or alternatively a Maker who retained the non-delivered instrument; 6) which was cancelled and removed from the stream of commerce under the Kentucky Uniform Commercial Code Chapter 355, et al. An admitted photocopy of the original Commercial Instrument which Sub Club holds is attached as Exhibit 1 hereto.[6]

Amended and Supplemental Answer, Record at 1728-29.

Stated otherwise, Sub Club has maintained that McKee and Resing, understood and intended prior to and during the execution of the October 12, 2010, agreement that the agreement would be of no legal force insofar as Resing was concerned. Instead, according to Sub Club, the parties effectuated a different (contemporaneous and oral) agreement: Resing agreed to "trade" all of his rights under the October 12, 2010, agreement to McKee immediately after executing the October 12, 2010, agreement; and McKee, in exchange, agreed to assign or promised to later assign Resing a 7 percent ownership interest from *her* existing membership interest in Sub Club (which would have been worth *less* than a 7 percent interest in Sub Club).[7]

---

[6] The referenced "admitted photocopy of the original Commercial Instrument which Sub Club holds" was a copy of the original October 12, 2010, agreement – with the word "void" written across it – that Sub Club had in its possession.

[7] For purposes of their "standing" theory – and to explain why Markus Resing's "7% ownership interest" was never mentioned in any of their tax or business filings prior to the initiation of this litigation – McKee and Sub Club have cited Section 12.1.5 of Sub Club's operating agreement, which provides that a member who assigns an ownership interest "shall be deemed for all purposes to continue to own their interest purported to be transferred and *shall continue to have all of the rights and obligations hereunder with respect thereto*." (Emphasis added.)

Sub Club asserts this contemporaneous oral agreement was effectuated; that McKee, after acquiring ownership of the October 12, 2010, agreement from Resing, "surrendered" it to Sub Club; and that Sub Club then unilaterally cancelled the October 12, 2010, agreement by having McKee write "void" and "Resing converted to/assigned 7% interest in Harper Sub Club 10/12/12" on the document. The end result, according to Sub Club, was that Resing no longer had any right to enforce the October 12, 2010, agreement afterward. Additionally, Sub Club argued it was impossible for Resing to demonstrate standing to enforce the October 12, 2010, agreement because, undisputedly, Sub Club and McKee had maintained exclusive possession of the original, signed document since the day it was executed.

As indicated, Sub Club takes issue with the circuit court's multiple rejections of this theory or its constituent parts. For this part of our analysis, however, it is only necessary to discuss the first rulings the circuit court made that fully rejected the constituent parts of its theory – because afterward, Sub Club *and McKee*[8] then proceeded to file repeated motions for reconsideration that largely

---

Consistently with that provision, any such "assignment" to Resing would also have been *less* than what he would have been entitled to receive under Section 3.(e)3 of the October 12, 2010, agreement.

[8] Resing's breach of contract claim was against Sub Club, not McKee – at least not directly. Nevertheless, McKee, in her individual capacity, also pressed Sub Club's UCC-based argument in her various filings during the litigation.

-10-

rehashed this theory; and the circuit court, refusing to change its position or ruling regarding the merits of the theory, repeatedly overruled their motions. By way of a January 7, 2022, partial summary judgment order, the circuit court had fully rejected the first part of Sub Club's theory (*i.e.*, Sub Club's assertion that Resing could not enforce the October 12, 2010, agreement because Sub Club, not Resing, had the original document memorializing the agreement in its possession, and Sub Club had "canceled" it by writing the word "void" on it). By and through the finalization of the appropriate jury instructions on November 3, 2022, the last day of the trial held in this matter, the circuit court then fully rejected the remainder of Sub Club's theory (*i.e.*, Sub Club's contention that Resing could not enforce the October 12, 2010, agreement because the parties had chosen to effectuate a different agreement instead).[9,10] Our review will accordingly focus upon those two essential rulings.

---

[9] The circuit court reserved ruling on Resing's motion in limine to preclude evidence of "any agreement between Plaintiff and Defendants other than the written contract between the parties," *see* Record at 2060, but it ultimately permitted the appellants, at trial, to adduce their evidence regarding McKee's purported "assignment" of interest to Resing.

[10] Resing argues the instructions that the jury were given regarding his breach of contract claim against Sub Club were broad enough to encompass Sub Club's latter contention (*i.e.*, that Resing could not enforce the October 12, 2010, agreement because the parties had chosen instead to effectuate a different agreement). Accordingly, he asserts the jury at least implicitly rejected that aspect of Sub Club's UCC theory; and that Sub Club's failure to move for a directed verdict at the close of all evidence therefore precludes any consideration of it. While this issue is a close call, we need not address it considering our disposition.

(a). The circuit court's January 7, 2022, partial summary judgment order was correct.

In response to motions from the parties, the circuit court entered an order on January 7, 2022, summarily determining that Resing had requisite standing to prosecute his breach of contract action against Sub Club. This was a purely legal issue, and Sub Club's failure to move for a directed verdict at the close of all proof at trial does not preclude our review of it. *See Auslander Props., LLC v. Nalley*, 558 S.W.3d 457, 463 (Ky. 2018). Standing, in the most basic constitutional sense, is defined by three requirements: (1) injury; (2) causation; and (3) redressability. *Cabinet for Health & Family Servs. v. Sexton*, 566 S.W.3d 185, 196 (Ky. 2018). The circuit court determined Resing had constitutional standing to sue Sub Club for breach of contract because: (1) Resing had produced a copy of the October 12, 2010, agreement he had undisputedly entered into with Sub Club, whereby Sub Club had promised to repay him $50,000 with interest or grant him a 7 percent ownership interest agreement; (2) Sub Club had undisputedly failed to repay Resing per the agreement or grant him the requisite ownership interest specified in the agreement; and (3) this kind of wrong – a purported breach of contract – was redressable under Kentucky law.

Notwithstanding, Sub Club maintained and continues to maintain Resing lacked standing to enforce the October 12, 2010, agreement because, undisputedly, (1) Sub Club, not Resing, possessed the original October 12, 2010,

-12-

agreement at all relevant times; and (2) Sub Club (by and through McKee) wrote the word "void" on the October 12, 2010, agreement.

But those facts, while uncontroverted, are immaterial. Sub Club's belief that its possession of the original October 12, 2010, agreement equated to *ownership* of the agreement, and that its subsequent notation of "void" on the face of that agreement effectively *cancelled* all of its obligations under that agreement, stems from its running assumption that the October 12, 2010, agreement was a "negotiable instrument" within the meaning of Article 3 of the Kentucky Uniform Commercial Code (UCC). To be sure, usually only the possessor or "holder" of a "negotiable instrument" may enforce such an instrument;[11] and the possessor or "holder" of a "negotiable instrument" may indeed discharge the obligation of a party to pay what is required by the instrument by writing "void" or other such words on the instrument, indicating it has been discharged.[12]

Contrary to Sub Club's belief, however, the October 12, 2010, agreement is not a "negotiable instrument." To be "negotiable," an instrument must provide for an *unconditional* promise to pay a sum certain on demand or at a fixed time and must be payable to order or to bearer. *See* Kentucky Revised Statutes (KRS) 355.3-104(1). But, the "Convertible Feature Option" described in

---

[11] *See* Kentucky Revised Statutes (KRS) 355.3-301.

[12] *See* KRS 355.3-604(1)(a).

-13-

sections 3.(c)-(e) of the agreement provided *express conditions* for payment: If either the specified "Borrower" (Sub Club) or the specified "Lender" (Resing) exercised their options, then the promise to pay would cease to exist – irrespective of whoever might have "held" the October 12, 2010, agreement. Thus, the agreement was non-negotiable. *See* KRS 355.3-106(1)(a).

Because the October 12, 2010, agreement is not a negotiable instrument, Article 3 of the UCC, as adopted in Kentucky, was never applicable in this case. *See* KRS 355.3-102(1). Because Article 3 never applied, the October 12, 2010, agreement is merely a contract governed by the fundamental rules applicable to contract law. Sub Club's notation of "void" across the face of the agreement was therefore meaningless, as no principle of ordinary contract law in Kentucky permits a party to unilaterally cancel a contract simply by writing "void" on the document memorializing it. Sub Club's possession of the original, signed agreement was not evidence that it "owned" the agreement.[13] Resing had standing to enforce the contract. The circuit court committed no error in this regard.

---

[13] Sub Club also asserts its "possession" of the original October 12, 2010, agreement proves it had an attached "security interest" in the agreement pursuant Article 9 of the Kentucky Uniform Commercial Code (UCC). *See* KRS 355.9-203. This is an offshoot from the aspect of its theory that, pursuant to a "contemporaneous oral agreement," Resing traded McKee all of his rights under the October 12, 2010, agreement for "value" (*i.e.*, in exchange for an assignment of her rights). *See* KRS 355.9-203(2)(a) (requiring "value" to be given for a security interest to attach to collateral). It is unnecessary to address this point beyond restating, as set forth herein, that Sub Club points to no relevant evidence supporting that Resing made any such "trade."

-14-

(b). <u>The circuit court correctly refused to instruct the jury regarding the remainder of Sub Club's theory.</u>

The circuit court's second essential ruling with respect to Sub Club's theory was its refusal to instruct the jury to determine whether the parties had a contemporaneous agreement not to enforce the October 12, 2010, agreement, and for Resing to instead receive something less than a 7 percent ownership interest in Sub Club, *e.g.*, an assignment of 7 percent of McKee's ownership interest in Sub Club. Relatedly, the circuit court also precluded Sub Club's representative (McKee) from testifying at trial that Article 3 of the UCC applied to the October 12, 2010, agreement and divested Resing of standing to sue, and it likewise refused to give the jury any such instruction.[14] Sub Club argues the circuit court erred in these respects. We disagree. Regarding Sub Club's UCC contentions, we have already explained that the UCC did not apply to the October 12, 2010, agreement, and we need not revisit that point.

As for Sub Club's associated "contemporaneous agreement" defense, "[a] trial court's decision on whether to instruct on a specific claim will be reviewed for abuse of discretion; the substantive content of the jury instructions will be reviewed *de novo*." *Sargent v. Shaffer*, 467 S.W.3d 198, 204 (Ky. 2015),

---

[14] Sub Club wanted the jury to determine, per the UCC, whether Resing sufficiently demonstrated he was a "holder" of the October 12, 2010, agreement or had violated presentment and transfer warranties.

-15-

*overruled on other grounds by Univ. Med. Ctr., Inc. v. Shwab*, 628 S.W.3d 112, 129 (Ky. 2021). Further, "[a] party is only entitled to instructions which are supported by the pleadings and evidence." *Evans v. Dotson*, 255 S.W.2d 476, 477 (Ky. 1953). Here, Sub Club's July 7, 2017, answer – the only operative *pleading* it filed in this matter – made no mention of Sub Club's associated "contemporaneous agreement" defense.

As for the *evidence*, Sub Club directs us to no writing or testimony from Resing verifying that any such contemporaneous agreement existed, and we have found no supporting evidence after reviewing the trial and extensive record before this Court. Sub Club merely references self-serving affidavits from its managing member, McKee, who swore that this contemporaneous agreement existed and was effectuated. These affidavits cannot be considered relevant evidence because: (1) they were never adduced at trial; and (2) the parol evidence rule – a point of law Resing repeatedly cited in opposition to Sub Club's "contemporaneous agreement" theory – barred their consideration as well as consideration of any trial testimony McKee offered on this subject. "It is well settled that evidence of a contemporaneous parol promise made to the payor of a note that he would not be bound by it is inadmissible and will not be permitted to defeat the positive and unqualified written promise of a promissory note." *Haynes v. Froehlich*, 273 S.W.2d 379, 380 (Ky. 1954) (citation omitted).

-16-

We have addressed the balance of Sub Club's cognizable arguments of error regarding Resing's breach of contract claim. They lack merit and do not indicate error or abuse of discretion. We therefore affirm this aspect of the circuit court's judgment.

**B. Fraudulent Conveyances**

Having affirmed Resing was Sub Club's unsecured creditor who was owed $50,000 by Sub Club, we now proceed to the "fraudulent conveyances" claims Resing asserted against both Sub Club and McKee. Resing asserted these claims under the purview of KRS 378A.040(a), part of the Kentucky Uniform Voidable Transactions Act ("KUVTA"), to void what he believed were invalid asset transfers from Sub Club to McKee (who then transferred the assets to other individuals) in derogation of his rights as Sub Club's creditor. Considering Sub Club and McKee were the only defendants Resing named in this matter, it appears he asserted these claims as a means of holding McKee – and no one else – alternatively liable. In relevant part, the instructions that were ultimately given regarding these claims to the advisory jury were:

> You will find for Resing if you are satisfied by a preponderance of the evidence that at some time or times *as part of or after the sale of Harper Sub Club's assets*, Defendant McKee knowingly participated in or knowingly condoned the transfer or disposition of money or property of Harper Sub Club with the intent to avoid payment of its debts or to cheat, hinder, and delay its creditors, including the Plaintiff.

-17-

> You will find for Harper Sub Club and McKee if, by the preponderance of the evidence, that transfers made by Harper Sub Cub [sic] were the result of the enforcement of a security interest. You will also find for Harper Sub Club and McKee if the transfers were made in the ordinary course of business or financial affairs of Harper Sub Club and McKee as an insider. . . .

Jury Instruction No. 5 (emphasis added), Record at 2143.

The advisory jury found in favor of Resing, and the circuit court adopted its advisory verdict. The instructions further asked for a determination of "so much of Harper Sub Club's Indebtedness to [Resing] as you believe from the evidence was made uncollectible by reason of such fraudulent transfer of money or property[.]" *See* Jury Instruction No. 6 and Question No. 7. Record at 2144. The advisory jury recommended an award of $50,000, which the circuit court adopted.

**2. Analysis**

As these instructions indicate, Resing did not seek to void any "fraudulent conveyances" Sub Club or McKee might have made *prior* to the sale of Sub Club's assets. The thesis of Resing's "fraudulent conveyances" claims against Sub Club and McKee was that Sub Club's *sale of its assets* (which occurred on April 17, 2017), yielded enough money to pay some or all of what it owed Resing, and that Resing thus had an equitable claim to *those* proceeds. Sub Club and McKee argue the evidence adduced at trial was insufficient to support

-18-

that conclusion or to demonstrate Resing had standing to assert these claims. We disagree.

Parenthetically, there appears to be some confusion in the briefs regarding whether Sub Club's and McKee's failures to move for a directed verdict at the close of all the evidence now precludes them from contesting the sufficiency of the evidence supporting the advisory jury's verdict relative to Resing's fraudulent conveyances claims, as adopted by the circuit court. To be clear, it does not preclude them from doing so. These claims were "tried by the court without a jury" and were thus subject to such a challenge regardless of any such motion. *See* Kentucky Rules of Civil Procedure (CR) 52.03. This is so, even though an "advisory jury" considered these claims. An action tried upon the facts with an "advisory jury" is not tried by a "jury," the necessary predicate for a directed verdict motion. Rather, such an action is tried by the court – which is why a court utilizing an advisory jury must render findings of fact and conclusions of law. *See* CR 52.01; *Morrison v. Trailmobile Trailers, Inc.*, 526 S.W.2d 822, 823 (Ky. 1975) ("It is fundamental that only juries return verdicts and that in all actions tried upon the facts without a jury or with an advisory jury the court finds facts.").

Our standard of review for reviewing a final judgment in actions tried by the court is:

> [B]ased upon the clearly erroneous standard set forth in CR 52.01, which provides that "[f]indings of fact shall

> not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." "If the trial judge's findings of fact in the underlying action are not clearly erroneous, *i.e.*, are supported by substantial evidence, then the appellate court's role is confined to determining whether those facts support the trial judge's legal conclusion." *Commonwealth v. Deloney*, 20 S.W.3d 471, 473-74 (Ky. 2000). However, reversible error arises when there is no substantial evidence in the record to support the findings of the trial court. *M.P.S. v. Cabinet for Human Resources*, 979 S.W.2d 114, 116 (Ky. App. 1998). Notwithstanding the deference due the trial court's factual findings, its conclusions of law reached after making its findings are reviewed *de novo*. *Hoskins v. Beatty*, 343 S.W.3d 639, 641 (Ky. App. 2011).

*Tavadia v. Mitchell*, 564 S.W.3d 322, 326 (Ky. App. 2018) (footnote omitted).

To challenge a conveyance as fraudulent, a plaintiff must suffer prejudice or injury resulting from the conveyance – that is the tenor of KRS 378A.040. Further, a creditor's remedy in a fraudulent conveyance action under either provision is limited to reaching the property which would have been available to satisfy the judgment had there been no conveyance. *Id*. Therefore, some portion of the debtor's assets would have been available to satisfy the unsecured creditor's claims had there been no conveyance.

In February of 2017, McKee entered into an agreement with Stinler, Inc. (Stinler) to sell all assets owned by Sub Club, Harper Norse Force Subs, LLC (Norse Force), and Harper on a Roll, LLC (Roll) to Stinler. These were three restaurants operated by McKee under a Jimmy John's Franchise Agreement.

-20-

Effectively, McKee consolidated the assets of all three businesses to effectuate the sale including all equipment, inventory and other property owned by the restaurants. Also included in the sale was the franchise agreement with Jimmy John's for all three restaurants. As noted, Jimmy John's was operated by McKee in all three restaurants including the Sub Club restaurant in Crescent Springs, Kentucky. A detailed listing of the assets of the respective restaurants being sold to Stinler was not included in or valued in the Asset Purchase Agreement. Rather, the $550,000 purchase price was allocated as follows:

| | |
|---|---|
| Equipment, Furniture and Fixtures: | $ 50,000 |
| Franchise Rights and other intangibles: | $ 450,000 |
| Goodwill | $ 50,000 |

*See* Asset Purchase Agreement at 2 (Plaintiff's Exhibit 15).

The inventory for each restaurant was to be valued on the date of closing and paid separately thereon. As Resing notes, at the time of the asset purchase, McKee directed Stinler to pay the purchase price in part as follows: (1) $93,972.25 to satisfy the outstanding balance of McKee's student loans; (2) $137,664 to Harper Property Management, LLC (HPM), an entity wholly owned by McKee; (3) $71,400 to McKee's sister; and (4) $84,302.99 to PNC Bank for outstanding loan or credit card balances partly attributable to McKee, personally, and some of her other business entities. *See* Plaintiff's Exhibit 7. Resing argues that none of these transfers was made to satisfy any of Sub Club's obligations, and

-21-

that all of them could have been voided as they appear to be for the personal benefit of McKee.[15]

Also paid from the proceeds of the sale was a secured debt in the amount of $52,280 owed to the Northern Kentucky Area Development District (NKADD). NKADD had loaned $100,000 to Sub Club in 2010 for the purchase of restaurant equipment, furniture and fixtures for the Jimmy John's restaurant operated by Sub Club in Crescent Springs. The loan was personally guaranteed by McKee and HPM. The collateral for the loan included the Sub Club assets purchased from the proceeds of the loan as well as real property owned by McKee and HPM.

McKee and Sub Club argue that only one third of the $100,000 purchase price paid for the furniture, equipment, fixtures and goodwill can be allocated to Sub Hub's portion of the assets sold, being approximately $33,000.[16] They further argue these proceeds were consumed by paying the secured debt to NKADD and thus no funds were available to pay Resing's debt. As concerns the $450,000 value assigned to the franchise rights sold for the three restaurants,

_____

[15] The circuit court made no findings specifying *which* of those transfers were "voided" for purposes of Resing's "fraudulent conveyances" claims.

[16] As noted, the total purchase price paid was $550,000. $100,000 of the purchase price was allocated to equipment, furniture, fixtures and goodwill for all three restaurants. The remaining $450,000 was allocated to franchise rights, which McKee argues that neither Sub Club nor its creditors was entitled to the benefit of these proceeds.

McKee argues that Harper on a Roll owned the franchise rights to both the restaurant it operated in Florence, Kentucky, as well as Sub Club's restaurant in Crescent Springs. Thus, McKee infers the $150,000 proceeds from the sale of the franchise rights for the Sub Club restaurant in Crescent Springs were not available to pay Sub Club creditors like Resing, since Harper on a Roll purportedly owned those franchise rights.

We find this argument to be disingenuous at best. Clearly, Sub Club could not operate its Jimmy John's restaurant in Crescent Springs without a franchise and this was the underlying premise for Resing to loan money to Sub Club for the restaurant. While McKee may have utilized the asset price allocation for accounting or tax purposes, Stinler would not have purchased the Sub Club restaurant at Crescent Springs without a Jimmy John's franchise. The assets of all three restaurants were consolidated together for sale by McKee, without detailing the actual assets sold or distinguishing how the purported title to the franchise rights were held. *See* Asset Purchase Agreement, Plaintiff's Exhibit 15.

The agreement to purchase these assets clearly infers that Sub Club had a Jimmy John's Franchise. The evidence presented at trial further established that Sub Club regularly paid Jimmy John's franchise fees. Plaintiff's Exhibits 51-54. And, in March of 2010, Sub Club paid a $30,000 franchise fee purportedly for the Highland Heights restaurant. Video Record, 11/1/2022 at 1:55:10-2:01 and

Plaintiff's Exhibit 51. The evidence further established that McKee used Sub Club funds to pay property taxes for HPM to McKee's benefit, and McKee regularly used Sub Club's credit card to make purchases for her personal benefit. The evidence also established that McKee regularly moved funds between the three restaurant bank accounts that one could describe as a shell game. The fact-finder in this case could easily conclude that Sub Club was entitled to have funds allocated from the sale of the restaurants' assets that McKee characterized as franchise rights in the sale. Yet the bulk of the sale proceeds were used to pay creditors for McKee's personal benefit, to the detriment of creditors like Resing. And, there was no evidence that any of those creditors had a superior lien claim to the franchise proceeds.

As concerns the fraudulent conveyance claims per KRS 378A.040 *et seq.*, we again look to Jury Instruction No. 5, which reads in pertinent part:

> You will find for Resing if you are satisfied by a preponderance of the evidence that at some time as part of or after the sale of Harper Sub Club's assets, Defendant McKee participated in or knowingly condoned the transfer or disposition of money or property of Harper Sub Club with the intent to avoid payment of its debts or to cheat, hinder, and delay its creditors, including the Plaintiff.

Record at 2143. And, Question No. 6 thereafter reads:

> **QUESTION NO. 6**: Do you find by a preponderance of the evidence that the [sic] McKee knowingly participated in or knowingly condoned the transfer or disposition of

-24-

> money or property of Harper Sub Club with the intent to avoid payment of its debts or to cheat, hinder, and delay its creditors, including Resing?
>
> **Answer: YES**
> **Signed: Michele Ciamei (foreperson)**

Record at 2143.

Given this aspect of the case is based upon findings made by the judge, deference must be given to the court in judging the credibility of the witness. CR 52.01. Additionally, even though conflicting evidence may have been presented, we must also defer to the circuit court in the weighing of said evidence. *Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003).

Based on our review of the trial record and applicable law, we find that the circuit courts findings are not clearly erroneous nor do we find any error in the advisory jury instructions or the $50,000 judgment entered by the circuit court against Sub Club. Accordingly, we affirm same.

## C. Piercing the Corporate Veil

Resing also asserted a veil-piercing claim against Sub Club and McKee as another means of holding McKee personally liable for the unpaid balance of what Resing loaned Sub Club. An advisory jury considered this claim; the circuit court adopted its advice to pierce Sub Club's veil; and our review of the circuit court's decision on this matter is again subject to the clear error standard set forth previously. *See Tavadia*, 564 S.W.3d at 326.

Sub Club's and McKee's contentions regarding this claim are varied and vague. We will address what can be deciphered from their briefs. One of Sub Club's and McKee's contentions is that the circuit court erroneously denied a pretrial motion for summary judgment they filed with respect this claim – a motion the circuit court denied after determining genuine issues of material fact precluded summary judgment. This is not a proper subject of review because an order denying a motion for summary judgment on that basis is generally not appealable. *See Transp. Cabinet, Bureau of Highways, Commonwealth of Ky. v. Leneave*, 751 S.W.2d 36, 37 (Ky. App. 1988). Once the trial in this matter began, the underlying purpose of summary judgment expired, and all matters of fact and law procedurally merged into the trial phase. *Id*. at 38. The appellants cite no exception to that rule, and we are aware of no exception applicable in this circumstance.

Again, they also take issue with the jury instructions. Kentucky law allows the corporate veil (or the veil of a limited liability company, as here) to be pierced when there is: "(1) domination of the corporation resulting in a loss of corporate separateness *and* (2) circumstances under which continued recognition of the corporation would sanction fraud or promote injustice." *Inter-Tel Techs., Inc. v. Linn Station Props., LLC*, 360 S.W.3d 152, 165 (Ky. 2012). Regarding the first of those elements, the court considers the following factors:

> (1) inadequate capitalization; (2) failure to issue stock;
> (3) failure to observe corporate formalities; (4)

nonpayment of dividends; (5) insolvency of the debtor corporation; (6) nonfunctioning of the other officers or directors; (7) absence of corporate records; (8) commingling of funds; (9) diversion of assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors; (10) failure to maintain arm's-length relationships among related entities; and (11) whether, in fact, the corporation is a mere facade for the operation of the dominant stockholders.

*Id*. at 163 (quoting *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 379 (7th Cir. 2008)).  The most important factors are inadequate capitalization, failure to observe corporate formalities, and the degree of control over the day-to-day operations and decisions.  *Inter-Tel Techs., Inc.*, 360 S.W.3d at 164.  As for the second element, there does not need to be a showing of actual fraud; a showing of injustice equating to something more than a mere inability to collect the debt from the corporation is sufficient.  *Id*. at 165.  It is enough to demonstrate that the owner-defendant siphoned corporate funds while on notice that the corporation had increasing liability to creditors and was unable to satisfy its debts and left the entity judgment-proof.[17]

---

[17] *See Inter-Tel Techs., Inc. v. Linn Station Props., LLC*, 360 S.W.3d 152 (Ky. 2012) (explaining in this context that "notable examples of injustice include where 'a party would be unjustly enriched; [where] a parent corporation that caused a sub's liabilities and its inability to pay for them would escape those liabilities; or an intentional scheme to squirrel assets into a liability-free corporation while heaping liabilities upon an asset-free corporation would be successful.'" *Id.* at 164 (quoting *Sea-Land Services, Inc. v. Pepper Source*, 941 F.2d 519, 524 (7th Cir. 1991)).

Sub Club and McKee argue the instructions provided to the advisory jury were erroneous and warrant reversal.  Specifically, they complain that with respect to the second element, the instructions asked the jury to determine whether there were "circumstances under which continued recognition [of Sub Club's corporate form] would sanction a fraud or promote injustice," but did not clarify that the requisite fraud or injustice should be something beyond the inability to pay a debt.  McKee's Brief at 27.

Based on our review, advisory Jury Instruction No. 7 and Question No. 8 provided to the advisory jury discussed and tracked all the *Inter-Tel* factors discussed above for piercing the corporate veil and did not misstate the law.  We find no error in the court's instructions to the advisory jury in this case or the court's reliance thereon in making findings on the corporate veil issue.

The circuit court's findings relative to this claim were as follows:

> The Court is satisfied by a preponderance of the evidence that that Defendant McKee knowingly participated in or knowingly condoned the transfer or disposition of money or property of Defendant Harper Sub Club, LLC[,] with the intent to avoid payment of its debts or to cheat, hinder, and delay its creditors, including Plaintiff Resing.  Defendant McKee used corporate funds for personal purchases, and when she sold the assets of the business, Defendant McKee transferred certain of the sale proceeds to Harper Property Management, LLC, a separate company that Defendant McKee solely owned, transferred certain of the sale proceeds to pay off her personal student loans, and transferred certain of the sale proceeds to pay off a

-28-

personal loan to her sister. The Court finds these transfers were not to pay off legitimate debts of Defendant Harper Sub Club, LLC, and the Court therefore finds in Resing's favor and against Defendant Harper Sub Club, LLC[,] and Defendant McKee that fraudulent transfers were made by Defendant Harper Sub Club, LLC[,] and Defendant McKee as defined under Kentucky law, that Resing was harmed as a result, and that an award in Resing's favor in the amount of $50,000 for those fraudulent transfers is appropriate in this case.

Additionally, the Court finds that Defendant McKee exercised domination over Defendant Harper Sub Club, LLC[,] resulting in a lack of corporate separateness and that continued recognition of Defendant Harper Sub Club, LLC[,] as a separate entity would sanction a fraud or promote injustice. Therefore, the Court finds in Resing's favor that it is appropriate to pierce Defendant Harper Sub Club, LLC's[,] corporate veil and find Defendant McKee liable personally for the debt owed to Resing. In making its determination, the Court has weighed the following factors:

(1) inadequate capitalization;
(2) failure to issue stock;
(3) failure to observe corporate formalities;
(4) nonpayment of dividends;
(5) insolvency of the debtor corporation;
(6) nonfunctioning of the other officers or directors;
(7) absence of corporate records;
(8) commingling of funds;
(9) diversion of assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors;
(10) failure to maintain arm's-length relationships among related entities; and
(11) whether, in fact, the corporation is a mere facade for the operation of the dominant stockholders.

-29-

The Court finds that [sic] foregoing factors strongly weigh in favor of piercing the corporate veil in this case. The evidence in the case, including much of evidence [sic] admitted by Defendant McKee and Defendant Harper Sub Club, LLC, proves that Defendant Harper Sub Club, LLC[,] was under-capitalized and frequently without sufficient funds to pay its bills. Defendants failed to observe corporate formalities and commingled funds. Evidence admitted showed that Defendant McKee would often use corporate funds for personal purchases and that Defendant McKee diverted the company's assets for her own use to Plaintiff Resing's detriment as a creditor. Additionally, Defendant McKee did not keep Defendant Harper Sub Club, LLC[,] separate from her other entities, frequently transferring money back and forth between four separate entities, and herself personally, as a matter of routine.

Record at 2145-46.[18]

As noted, the circuit court adopted the jury's advisory findings on this issue and thoroughly analyzed those findings in conjunction with making the court's findings that supported piercing the corporate veil to hold McKee liable for Sub Club's indebtedness to Resing. Accordingly, based on the evidence presented at trial and applicable law, those findings are also not clearly erroneous.

## II. **January 3, 2024 sanctions order**

On January 3, 2024, the circuit court awarded Resing sanctions against Sub Club and McKee for $2,475 in attorney's fees and $25 in costs

---

[18] The Court notes that the Record on Appeal contains two pages numbered "2145" and the quoted record above in this Opinion contains three pages.

pursuant to CR 11 in connection with motions for reconsideration Sub Club and McKee filed on November 17, 2022. The circuit court did so after determining the court had already repeatedly addressed the issues raised in the appellants' motions for reconsideration; and that the appellants had brought their motions to delay, harass, and needlessly increase the cost of this litigation. Sub Club and McKee argue the circuit court's award of sanctions was erroneous. We disagree.

Where CR 11 sanctions are imposed, our courts employ a multistandard approach, applying "a clearly erroneous standard to the trial court's findings in support of sanctions, a *de novo* review of the legal conclusion that a violation occurred, and an abuse of discretion standard on the type and/or amount of sanctions imposed." *Clark Equip. Co., Inc. v. Bowman*, 762 S.W.2d 417, 421 (Ky. App. 1998). "The test to be used by the trial court in considering a motion for sanctions is whether the attorney's conduct, at the time he or she signed the allegedly offending pleading or motion, was reasonable under the circumstances." *Lexington Inv. Co. v. Willeroy*, 396 S.W.3d 309, 312-13 (Ky. App. 2013).

Regarding those circumstances, the issues raised in most of the appellants' November 17, 2022, motions for reconsideration concerned the aspect of their UCC theory that contested Resing's standing to sue for breach of contract. To review, the circuit court's January 7, 2022, order determined Resing had constitutional standing, a ruling that was mutually exclusive with the first

component of Sub Club's UCC-based argument that asserted Resing lacked constitutional standing because it and McKee, not he, had "possession" of the October 12, 2010, agreement and had written "void" upon it. As for the second component of Sub Club's UCC-based argument (*i.e.*, whether admissible evidence supported Sub Club's contention that Resing had traded his rights in the October 12, 2010, agreement to McKee as part of a separate, contemporaneous agreement), the circuit court refused to resolve it until after trial; and the circuit court ultimately did so through its determination of the appropriate jury instructions.

Sub Club and McKee were not satisfied with how the circuit court resolved those components of Sub Club's UCC-based argument. Thus, on January 19, 2022, Sub Club and McKee moved the circuit court to reconsider its January 7, 2022, order. In doing so, they repeated Sub Club's UCC-based argument. They insisted the circuit court's findings set forth in the January 7, 2022, order, relative to Resing's standing to sue, had not been based on any relevant evidence in the record. In their view, all that was relevant was their "possession" of the October 12, 2010, agreement; their writing of "void" upon it; and their representations that Resing had traded his rights in that agreement to McKee as part of a separate, contemporaneous oral agreement. They insisted their motion for reconsideration was necessary because the circuit court, in their view, "continues to refuse to engage the positive law." Record at 1223.

Resing responded to their motion with the same arguments the circuit court found persuasive in its January 7, 2022, order. He also moved for CR 11 sanctions against Sub Club and McKee, arguing no new facts and no change in the law justified either the delay presented by the appellants' motion or the expense of resolving it.

On April 25, 2022, Sub Club moved for the mandatory disqualification of the presiding judge. Sub Club's motion substantially repeated its UCC-based argument and accused the judge of violating Judicial Canons by failing to properly address it. Sub Club sought the judge's removal per KRS 26A.020. The Chief Justice of the Kentucky Supreme Court denied the motion on May 5, 2023. On May 23, 2022, Sub Club then moved the presiding judge to voluntarily recuse himself per KRS 26A.015. The motion substantially repeated Sub Club's UCC-based argument and accused the judge of violating Judicial Canons by failing to properly address it.

On June 3, 2022, the circuit court entered two orders, the first of which reserved ruling upon Resing's motion for sanctions. In the second order, it denied Sub Club's and McKee's motions for reconsideration, explaining its January 7, 2022, order if not prior orders had resolved each of the issues raised in their motions; and that it would "not re-address the arguments made and its findings from that order." As for Sub Club's recusal motion, the circuit court

-33-

denied it in a July 21, 2022, order, explaining, "The majority of Defendant's argument is that the judge did not rule in their favor on certain issues. Defendant may appeal those rulings."

Undaunted, Sub Club and McKee filed a joint motion for summary judgment on September 1, 2022, contesting Resing's standing, again based upon Sub Club's UCC theory. Resing prefaced his response to their motion by noting the bulk of it was yet another version of what the circuit court had repeatedly rejected. The circuit court denied Sub Club's and McKee's motion.

On October 2, 2022 – five years after this litigation was initiated, and less than two months before trial – Sub Club and McKee then sought leave to file amended answers which reiterated Sub Club's UCC theory under the pretense of "allegations." They asserted it as an "affirmative defense" and repackaged it into three ostensible UCC-based "counterclaims." Resing opposed their proposed amendments as futile and untimely. The circuit court denied Sub Club and McKee leave to amend. Tangentially, Sub Club and McKee raise no discernable arguments that the circuit court abused its discretion by denying their motions for leave to file amended answers.

On November 17, 2022, hours after the circuit court entered its final judgment resolving Resing's claims, Sub Club and McKee, together and separately, then filed and served the motions for reconsideration that ultimately led

-34-

to the circuit court's January 3, 2024, sanctions order. Of their *four* motions, three asked the circuit court to reconsider prior rulings the court had made rejecting Sub Club's UCC theory (*i.e.*, its orders denying their motions for leave to amend and their joint motion for summary judgment). In his responses to the appellants' motions, Resing made the same arguments he had previously made in rebuttal to the appellants' UCC theory. He also renewed his motion for sanctions. As noted, the circuit court granted his motion and assessed sanctions against both Sub Club and McKee due to the filing of their November 17, 2022, motions.

On appeal, Sub Club and McKee do not contest the amount of sanctions they were assessed. They instead offer meandering diatribes in support of why, in their view, *any* award of sanctions was inappropriate. Some of what they assert relates to this subject, some of it strays into other legal issues.[19] We will address what can be reasonably gleaned from their briefs. First, Sub Club argues the circuit court's sanctions were improper because they were "imposed prematurely or in a manner that curtails legitimate legal defenses." Sub Club's

---

[19] For example, interspliced with their arguments regarding why the circuit court's sanctions order should be reversed or vacated, the appellants note they filed a countermotion to either strike Resing's CR 11 motion or for CR 11 sanctions against Resing, which the circuit court denied. They claim the circuit court's denial was indicative of bias, but only vaguely discuss the substance of their motion and do not address why the circuit court denied it. To the extent the appellants cite this as a point of error, it is not what our civil rules consider an "argument" in support of their position, and we will not address it. *See* Kentucky Rules of Appellate Procedure 32(A)(4); *Cherry v. Augustus*, 245 S.W.3d 766, 780 (Ky. App. 2006) ("As a general rule, assignments of error not argued in an appellant's brief are waived.").

Brief at 33. Sub Club adds little more; and in any event, we disagree. Nothing remained to be adjudicated when the circuit court issued its sanctions because, prior to or contemporaneously with the entry of its January 3, 2024, order, the circuit court finalized its disposition of this matter by entering additional orders overruling the remainder of the appellants' outstanding post-judgment motions. *See* CR 11 (providing "[t]he Court shall postpone ruling on any Rule 11 motions filed in the litigation until after entry of a final judgment.").

Sub Club and McKee also assert their sanctions were the product of retaliation and were thus improper. In support, McKee, for her part, notes that she and Sub Club were issued sanctions after Sub Club sought (unsuccessfully) to have the presiding judge recuse from this litigation. In addition, Sub Club and McKee note they were sanctioned after they filed or threatened to file a civil action against the presiding judge. McKee also asserts the circuit court's retaliation and bias is further illustrated by the fact that the circuit court awarded Resing prejudgment interest. We disagree. Resing's award of prejudgment interest was not indicative of bias. It was required because his judgment was for a liquidated sum. *See Nucor Corp. v. Gen. Elec. Co.*, 812 S.W.2d 136, 141, 144 (Ky. 1991). Apart from that, Sub Club and McKee cite nothing beyond their own conjecture that their sanctions were retaliatory; and they cite no authority precluding a presiding judge from

issuing sanctions to a litigant simply because the litigant has *alleged* in a lawsuit or recusal motion that the presiding judge is guilty of improper conduct.

Relatedly, a judge is not disqualified merely because a litigant sues or threatens to sue him or her, or moves for their recusal – otherwise, it would require disqualification every time a litigant files suit against a judge and would allow litigants to judge shop. Rather, "[t]here must be a showing of facts of a character calculated seriously to impair the judge's impartiality and sway his judgment. . . . A party's mere belief that the judge will not afford a fair and impartial trial is not sufficient grounds to require recusal." *Snowden v. City of Wilmore*, 412 S.W.3d 195, 205 (Ky. App. 2013) (internal quotation marks and citations omitted). As for whether the presiding judge in this matter *should* have recused, only McKee makes a passing argument to that effect in her brief. She cites, at most, only her strong disagreement with the circuit court's rulings relating to Sub Club's UCC argument and award of prejudgment interest to Resing, which is an insufficient basis upon which a reasonable person could question the circuit court's impartiality. We are satisfied that there was no error. Moreover, that argument is not preserved as far as McKee is concerned because only Sub Club moved for recusal below.

Last of all, Sub Club and McKee both reiterate (at length) their UCC theory. Taken objectively, it appears the appellants' assertion is that they were entitled to repeatedly press their theory that Resing lacked standing to sue for

breach of contract because they earnestly believed their theory was correct –
notwithstanding the circuit court's repeated rejections of their theory and directives
to stop pressing it and instead wait for an appeal to do so.

If that is indeed their argument, Sub Club and McKee miscomprehend
the issue. "[An] imposition of a Rule 11 sanction is not a judgment on the merits
of an action. Rather, it requires the determination of a collateral issue: whether the
attorney has abused the judicial process, and, if so, what sanction would be
appropriate." *Willy v. Coastal Corporation*, 503 U.S. 131, 138 (1992) (internal
quotation marks and citation omitted). Here, the focus is upon the abuse of the
judicial process by continually asking a court to reconsider its prior rulings. The
purpose of asking any court to do so is to direct the court's attention to an issue it
has *overlooked*. As explained in *Gullion v. Gullion*, 163 S.W.3d 888, 893 (Ky.
2005):

> There are four basic grounds upon which a
> [reconsideration] motion may be granted. First, the
> movant may demonstrate that the motion is necessary to
> correct manifest errors of law or fact upon which the
> judgment is based. Second, the motion may be granted
> so that the moving party may present newly discovered
> or previously unavailable evidence. Third, the motion
> will be granted if necessary to prevent manifest injustice.
> Serious misconduct of counsel may justify relief under
> this theory. Fourth, a [reconsideration] motion may be
> justified by an intervening change in controlling law.

*Id*. (internal footnote omitted).

An argument the court has already reviewed and addressed – correctly or incorrectly – has not been "overlooked" by the court absent an intervening change in the law, or newly discovered or previously unavailable evidence. That is the case here with respect to the appellants' UCC argument, as there was no "wrong" that their motions for reconsideration could have "righted": In their motions for reconsideration, the appellants reiterated what they had always reiterated but cited no new facts or intervening law.

With that in mind, the sanctionable conduct in this matter is more basic to litigation than even the concepts of collateral estoppel and res judicata. Once a trial court has ruled on an issue in a case, the issue is properly concluded unless one of the above-stated *Gullion* exceptions applies. If no such exception applies, the ruling may be appealed once a final order is entered; but a motion for reconsideration or similar filing is not a legally tenable means of seeking to have the trial court change its original decision; and it follows that repeatedly making such filings – forcing opposing counsel and the court to spend time, effort, and judicial resources to readdress the same issues – abuses the judicial process, is indicative of bad faith, and violates CR 11.[20]

---

[20] *See, e.g.*, Federal Rules of Civil Procedure (FRCP) 11 adv. cmte. notes (1993) (explaining the rule permits sanctions against a party "for insisting upon a position after it is no longer tenable."); *Magnus Electronics, Inc. v. Masco Corp. of Indiana*, 871 F.2d 626, 630 (7th Cir. 1989), *cert. denied*, 493 U.S. 891 (1989) (motion to reconsider is frivolous if it contains no new evidence or arguments or law that explains why court should change an original order); *see also Clark Equipment Co., Inc. v. Bowman*, 762 S.W.2d 417, 420 (Ky. App. 1988) (relying on federal

After the circuit court's January 7, 2022, order, its subsequent orders, and even an opinion from the *Kentucky Supreme Court* regarding this litigation,[21] it should have been obvious to the appellants that the circuit court would not revisit its rulings again, and that their proper remedy was a direct appeal to this Court. Their attempts to relitigate this issue yet again through their November 17, 2022, motions for reconsideration are evidence of an improper purpose sufficient to justify the issuance of sanctions. The circuit court did not abuse its discretion or otherwise err by sanctioning the appellants, and we accordingly affirm this aspect of these appeals.

### III. March 7, 2024 Order denying appointment of receiver

On December 18, 2023, Sub Club and McKee filed a "motion to appoint receiver and notice of superior possessory lien and secured interest under KRS 355.9." To summarize, they alleged the October 12, 2010, agreement was a negotiable instrument that constituted personal property; that Resing had no ownership interest in it; and that because they "possessed" the October 12, 2010, agreement, Resing had no right to take it from them or have it reduced to a

---

caselaw and Federal Civil Rules Advisory Committee commentary regarding FRCP 11 as persuasive authority for interpreting CR 11).

[21] Sub Club and McKee sought a writ of prohibition from this Court based upon their UCC theory. We denied her petition and the Kentucky Supreme Court affirmed our disposition, adding: "[E]ach assignment of error they raise now may also be raised through direct appeal[.]" *Harper Sub Club, LLC v. Schrand*, No. 2020-SC-0372-MR, 2021 WL 3828632 (Ky. Aug. 26, 2021).

judgment. As such, they argued "[a] receiver should be appointed for preserving the Article 9 collateral" (*i.e.*, the October 12, 2010, agreement) "and preserving Defendants' rights in the collateral, under the Kentucky commercial law, which prevent Plaintiff from levying on any property based on [this] common law, constitutionally infirm trial Order[.]" Record at 2524-25.

The circuit court's March 7, 2024, order denied their motion, and we agree with that disposition for at least two reasons. First, the October 12, 2010, agreement was not a "fund," nor was it a negotiable instrument and thus "property," that a receiver could have preserved. *See* KRS 425.600(1). Second, the circuit court only had authority to appoint a receiver "during the pendency of the action[.]" KRS 425.600(1). But, by the time the circuit court ruled on the appellants' motion, the action was no longer pending before it because the appellants had already filed their notices of appeal and invoked our jurisdiction. To elaborate:

> The effect of an appeal is to remove the cause to the higher forum and to continue the proceedings there. A cause cannot progress at the same time in the inferior and appellate tribunal. It follows therefore that when an appeal has been taken the case is no longer pending in the lower court[.]

*Ohio River Contract Co. v. Gordon*, 189 S.W. 451, 453 (Ky. 1916) (internal quotation marks and citation omitted). We accordingly affirm the March 7, 2024, order.

-41-

# CONCLUSION

To the extent the appellants have raised any other arguments not specifically addressed herein, we find them to be unpreserved, unpersuasive, moot, or without merit. For the foregoing reasons, we affirm the circuit court's judgment and orders in their entirety.

ALL CONCUR.

BRIEFS FOR APPELLANTS:

Paige A. McKee
Erlanger, Kentucky

BRIEFS FOR APPELLEE:

Frank K. Tremper
Douglas S. Williams
Covington, Kentucky